**EXHIBIT A**

Case 11-04225    Doc 8-1    Filed 09/26/11    Entered 09/26/11 15:23:33    Desc
Exhibit(s) A    Page 1 of 20

**EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Bky. Case No. 11-43113 |
| Curtis C. Nelson | Chapter 11 |
| Debtor, | Hon. Robert J. Kressel |
| | |
| Fulcrum Consulting, LLC, | |
| Plaintiff, | Adv. Pro. No:_____ |
| v. | |
| Curtis C. Nelson, | |
| Defendant. | |

### COMPLAINT TO EXCEPT CERTAIN DEBTS FROM DISCHARGE

Plaintiff, Fulcrum Consulting LLC, as and for their Complaint against Defendant, Curtis C. Nelson, states and alleges as follows:

### I. INTRODUCTION

Fulcrum Consulting, LLC ("Fulcrum") brings this Complaint against Curtis C. Nelson ("Nelson") in order to obtain a determination that certain debts owed to Fulcrum by Defendant are nondischargeable pursuant to section 523(a) of the Bankruptcy Code. These debts owed by Defendant should be declared dischargeable because Defendant used false pretenses, made false representations, and committed fraud against Fulcrum in order to obtain services and withhold money rightfully earned and belonging to Fulcrum. Additionally, Defendant used material false statements in writing describing his financial

condition, that Fulcrum reasonably relied upon, that Defendant made with the intent to deceive, in order to receive additional services and continue to withhold payments to Fulcrum.

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over this proceeding and all causes of actions asserted herein pursuant to 28 U.S.C. § 1334.

2. This action constitutes a core proceeding under 28 U.S.C. §157(b) because it seeks a determination as to the dischargeability of certain debts.

3. Venue is proper in the District pursuant to 28 U.S.C. § 1409.

## III. PARTIES

4. Plaintiff Fulcrum Consulting LLC is a limited liability company, which conducts business in the State of Minnesota, including Hennepin County.

5. Defendant Curtis C. Nelson is a Minnesota resident, was the owner of Visible Customers ("Visible"), and at all times relevant hereto served as the President and Chief Executive Officer of Visible.

## IV. FACTUAL BACKGROUND

6. On December 28, 2010, Honorable Judge John Sommerville found Defendant, Curtis C. Nelson guilty of intentional fraud upon Crown Bank to induce Crown Bank to extend a $3,000,000 loan to Defendant and extend the maturity date of said $3,000,000 loan. (A copy of the order is attached hereto as Exhibit A.)

7. Between October 1, 2008 and August 3, 2009, Visible, through Defendant and Fulcrum entered into numerous agreements whereby Fulcrum agreed to provide consultants to Visible at Visible's request for an agreed-upon compensation.

8. Fulcrum fully performed all of its contractual obligations. Defendant failed to pay as promised and owes Fulcrum $575,746.18 for the aforementioned services.

9. With respect to the amount owed to Fulcrum, Visible, through Defendant, have repeatedly represented and admitted to Fulcrum that Defendant will pay the amount owed.

10. Defendant, has stated "it is our [Visible's] intention to have you [Fulcrum] receive all of the monies that are owed to you," "we [Visible] need to focus on getting you [Fulcrum] a partial payment, and a plan to get you paid what we owe you," "realistically, I need to figure out a way to insure we can pay you what we owe you in cash in the near term and I am confident I can do that," and "I can't tell you how much I appreciate the kind of partners you [Fulcrum] have been for us [Visible], and I am committed to making this work for you equally as well."

11. Defendant agreed to pay Fulcrum the amount owed. The agreement stated that Defendant would pay a lump sum down payment of $250,000.00 in September 2009, with payments to continue on the remaining balance.

12. Defendant represented to Fulcrum Consulting via email on September 2, 2009 that, "…we are now in receipt of a hard commitment letter to finance the business…"

13. By the middle of September, Fulcrum still had not been paid for their services to Visible. Defendant represented to Fulcrum Consulting via email on September 18, 2009 that, "The timeline I thought we set was to reassess if we couldn't get you paid by next week. However, I have made some progress, and we can probably make a good faith payment …"

14. In an attempt to receive the promised $250,000 dollars, Fulcrum contacted Defendant. Defendant then represented to Fulcrum via email on September 23, 2009 at 11:58 AM that, "I had hoped we would have you current by now, and we would have if it were not for the unfunded Commitment letter. …I believe by the Fourth we will be able to pay you $250,000, and I am working on accelerating that right now."

15. Defendant represented to Fulcrum Consulting via email on September 23, 2009 at 2:26 PM that, "Eric, I think the 100k by the end of the week or prior to the days start on Monday, and the 175k by the 4th would be possible…it's really tight even to have the loan I'm currently doing paperwork on to close because of the time that it takes the banks to go through the process of closing a loan…"

16. On September 25, 2009, Defendant represented to Fulcrum Consulting via email that, "I had Karen prepare two checks one post dated for Monday and one for the 4th. I'll give you a heads up if we receive the funds today, buy they will likely be transferred in Monday morning. …"

17. Visible, through Defendant, tendered to Fulcrum two separate checks totaling $250,000.00 (one check for $100,000.00 and one check for $150,000.00). Both checks were bad due to insufficient funds

18. On October 5, 2009 Defendant represented to Fulcrum Consulting via email that, "Wow I was really upset and surprised to get your email, because I was sure that check had cleared last week. Karen (our controller) was out having Surgery and her first day back was today, so I asked her to get me a reconciliation of our account because I had made provisions for that check…So tomorrow I will find

-4-

out what happened and get another check issued. … I had expected to close on a loan last week, but at the last min. the lender wanted an outrageous, and previously unannounced fee… it now appears I have a conventional lender willing to do at least enough to get you paid and get us back on our feet and fund (at 5.35%) by Thursday this week (I am just taking out a personal loan to insure we get you paid at this point). I also have another non-conventional lender that tells me they can fund by Fri. or the following Monday. …"

19. To explain the long process of receiving their money, Defendant represented to Fulcrum Consulting that via email on October 13, 2009 that, "The Bank I am using is fairly new to this region and is still using underwriters out of their corporate office in Texas. My Banker here is with us, and he thought it was done but for the one question on Friday, and so he has no idea what the holdup is. … My Banker seems to be pretty confident, in fact confident enough he has initiated the paper work on another transaction, as possible follow on, if we need it. …"

20. Defendant represented to Fulcrum Consulting via email on October 14, 2009 that, "The bank called this morning and asked for some further documentation, and of course I provided it for them immediately. … My banker is still sure it is going to happen, but I am getting a little nervous. … I have a meeting this afternoon with a Hard Money guy who says he can turn around the funds by tomorrow if this doesn't come through …"

21. After over 5 months of trying to receive their funds, Defendant met with Dan Emehiser of Fulcrum Consulting on January 20, 2010 in the Visible Customer office.

-5-

22. Defendant admitted to Dan Emehiser on January 20, 2010 that he knew that Visible Customer had insufficient funds to cover the checks he issued to Fulcrum Consulting on September 28, 2009 and October 5, 2009.

23. Upon information and belief, Defendant told Siamak Masoudi, a former Officer for Visible Customer, that Defendant was fully aware that the checks Defendant had presented to Fulcrum Consulting in 2009 were bad when they were written and presented to Fulcrum Consulting.

24. Upon information and belief, Defendant told Siamak Masoudi that Defendant knew that no money existed in the bank account to cover the 2 checks presented to Fulcrum Consulting.

25. Upon information and belief, Defendant told Siamak Masoudi that Defendant presented the 2 checks to buy more time and extend the service obligation Fulcrum Consulting was providing.

26. Upon information and belief, Defendant told Karen Ratcliff, a former employee of Visible Customer, that Defendant was fully aware that the checks Defendant had presented to Fulcrum Consulting in 2009 were bad when they were written and presented to Fulcrum Consulting.

27. Defendant fraudulently misrepresented to Fulcrum Consulting regarding his ability to pay Fulcrum Consulting.

28. On May 2, 2011 Defendant filed a voluntary Chapter 11 Bankruptcy Petition.

## V. COUNT I

**(11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation and Actual Fraud)**

29. Plaintiff re-alleges and re-asserts the allegations contained in the foregoing paragraphs and incorporates them by reference

30. Section 523(a)(2)(A) of the Bankruptcy Code provides that a Defendant may not be discharged from any debt "for money, property, services, or an extension, renewal or refinancing of credit to the extent obtained by…false pretenses, a false representation or actual fraud."

31. Between October 1, 2008 and August 3, 2009, Visible, through Defendant, and Fulcrum entered into numerous agreements whereby Fulcrum agreed to provide consultants to Visible at Visible's request for an agreed-upon compensation. Fulcrum completed all contractual obligations and began demanding their benefit of their bargain. For over 5 months, Fulcrum attempted to collect their money. For over 5 months, Defendant misrepresented his ability to pay Fulcrum the amounts owed.

32. Defendant made numerous representations and accounts of perspective financing for his company to pay Fulcrum for the services provided that were completely false. In an Oct 5, 2009 e-mail, Defendant wrote "…it now appears I have a conventional lender willing to do at least enough to get you paid." This financial institution along with the others mentioned in his other statements never came through.

33. These representations as well as the others were based on false information and fraudulent behavior, as upon information and belief, Defendant did not have any financing to ever pay Fulcrum for their services.

34. Defendant knew that the representations he made were false and intended Fulcrum to act on the false representations. Defendant knew he didn't have any money even when he sent two checks to Fulcrum in the amount of $250,000. On January 20, 2010, Defendant admitted to Fulcrum in a meeting that he knew that Visible Customer had insufficient funds to cover the checks he issued to Fulcrum Consulting on September 28, 2009 and October 5, 2009.

35. Fulcrum was induced to act, and did act, in reliance on the false representations because throughout the months of not getting paid Fulcrum stayed very patient due to Defendant's written promises. By actively communicating with Fulcrum, Defendant tricked Fulcrum into reasonably relying on his statements. Defendant made it seem he was doing everything he could to get Fulcrum their money.

36. As a direct and proximate result of Defendant's conduct, Fulcrum has suffered and will continue to suffer from the damages caused by Defendant.

37. By reason of the foregoing, Defendant is liable to Fulcrum for the damages he sustained in excess of $500,000, which debt is nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE,** Plaintiff Fulcrum Consulting LLC respectfully requests as follows:

    1. A judgment against Defendant Curtis C. Nelson in excess of $500,000, plus interest;

2. A declaration that Defendant's debts to Plaintiff are excepted from discharge under 11 U.S.C. § 523(a)(2)(A); and

3. Such further relief as this Court deems just and proper under the circumstances.

Dated: August 4, 2011

By: /s/ Justin L. Seurer
Justin L. Seurer (#336154)
**Seurer Law Firm**
175 Jackson Ave N. Ste 285
Hopkins, MN. 55343
(612) 455-6669

*Attorneys for Fulcrum Consulting, LLC*

-9-

## VERIFICATION

I, Justin Seurer, Attorney for Fulcrum Consulting, declare under penalty of perjury that I have read the foregoing Complaint to Determine Dischargeability of a Particular Debt under 11 U.S.C. § 523(a)(2)(A), know the contents of the this Complaint, and that the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Dated: August 4, 2011                                     /s/ Justin L. Seurer
                                                          Justin L. Seurer

| | | |
|---|---|---|
| STATE OF MINNESOTA | FILED<br>2010 DEC 28 PM 3: 30<br>BY_____DEPUTY<br>HENN CO. DISTRICT<br>COURT ADMINISTRATOR | DISTRICT COURT |
| COUNTY OF HENNEPIN | | FOURTH JUDICIAL DISTRICT |
| | | CASE TYPE: CONTRACT |

| | |
|---|---|
| Crown Bank,<br><br>          Plaintiff,<br><br>vs.<br><br>Curtis C. Nelson<br><br>          Defendant. | Court File No. 27-CV-10-24189<br>Judge John J. Sommerville<br><br>[PROPOSED] ORDER FOR PRE-JUDGMENT ATTACHMENT |

The above-captioned matter was brought before this Court on the 28th day of December, 2010 upon the Plaintiff's motion for pre-judgment attachment. The motion and supporting affidavits and exhibits were submitted to the Court. At the hearing, Defendant was given the opportunity to identify exempt property, without waiver of the right to claim exemption in property not identified at the hearing.

This Court, having heard the arguments of counsel, having reviewed the memoranda and affidavits submitted by the parties, having considered all of the files, records and proceedings in this action, and being otherwise fully advised, makes the following specific findings required by Minnesota Statute section 570.026.

The following persons submitted affidavits to the Court in support of Plaintiff's Motion for Pre-Judgment Attachment:

    a.    John C. Lindquist
          Senior Vice President, Crown Bank

    b.    David Marion
          International Rarities Corporation

The affidavits and Verified Second Amended Complaint are attached hereto and incorporated herein.

### FINDINGS OF FACT

The affidavits and exhibits submitted in support of Plaintiff's Motion for Pre-Judgment Attachment adequately support the finding of the following specific facts:

1. On August 28, 2008, Plaintiff and Defendant entered into a $3,000,000.00 Loan (the "Loan"), identified by Loan Number 4082129. (Affidavit of John C. Lindquist "Lindquist Aff." ¶ 3; Verified Second Amended Complaint ("SAC") Ex. A.)

2. Defendant executed a Promissory Note in connection with the Loan, dated August 28, 2008. (*Id.*)

3. Defendant delivered a personal financial statement to Crown Bank, dated July 2007, verified as of July 28, 2008, representing that:

   (1) His two residences valued at $6,936,400;
   (2) Total liabilities of $9,720,109.44; and
   (3) His net worth of $18,570,215.06.

(Lindquist Aff. ¶¶ 3, 22, Ex. A.)

4. In his verified July 2008 personal financial statement, Defendant stated that the appraisal of his residences was conservative, that he would be obtaining another appraisal, and that he would forward the new appraisal to Crown Bank. (Lindquist Aff. ¶ 22, Ex. A.)

5. Crown Bank's decision to extend the Loan to Defendant was based, in part, upon the representations Defendant made in the July 2008 verified personal financial statement. (Lindquist Aff. ¶ 3.)

6. Pursuant to the terms of the Promissory Note, Defendant was "required to maintain a minimum liquidity of $3,000,000.00 tested monthly" and was required to submit to a brokerage statement to Crown Bank on a monthly basis and a personal financial statement and

tax return to Crown Bank on an annual basis. (Lindquist Aff. ¶ 3.)

7.  Defendant's signature on the personal financial statements he submitted to Crown Bank acknowledged his duty to provide "true, correct and complete" information to the bank. (Lindquist Aff. Exs. A, D, E.)

8.  As security for the Loan, Defendant executed a Security Agreement dated August 28, 2008, wherein he initially pledged and granted a security interest to Crown Bank in "business investments to be delivered to the Bank from time to time," including 2,542,373 units of Visible Customer Holdings, LLC stock (the "Security Agreement"). (Lindquist Aff. ¶ 4; SAC Ex. B.)

9.  The original maturity date of the $3,000,000 Loan was August 28, 2009. (Lindquist Aff. ¶ 5.)

10.  On or around March 11, 2009, Defendant provided Crown Bank with another verified personal financial statement. In his verified personal financial statement dated December 31, 2008, verified on March 11, 2009, Defendant Nelson represented the following as his assets and liabilities:

(1)  His two residences at $6,952,277.09 and $989,577.13;
(2)  Total liabilities of $10,336,011.44; and
(3)  His net worth of $11,721,262.16.

(Lindquist Aff. ¶ 22, Ex. D.)

11.  In August 2009, Crown Bank agreed to extend the Loan's maturity date to February 2010. (Lindquist Aff. ¶ 6.)

12.  In January 2010, John Lindquist, Senior Vice President at Crown Bank, contacted Defendant to remind Defendant that the Loan was set to mature, and to inform him that Crown Bank would not extend the maturity date of the Loan without obtaining additional security. (Lindquist Aff. ¶ 7.)

3

EX3 of 9.

13. As of January 2010, the Loan was in default for violation of the $3,000,000 liquidity covenants. (*Id.*)

14. In January 2010, Defendant informed Mr. Lindquist that he was willing to pledge his grandfather's coin collection, worth in excess of $2,000,000, as collateral for the Loan. (Lindquist Aff. ¶ 8.)

15. Mr. Lindquist asked Defendant to provide evidence of the value of the coin collection. (Lindquist Aff. ¶ 9.)

16. In response, Defendant provided Crown Bank with a liquidity statement together with a letter from Dave Marion at International Rarities Corporation, dated October 8, 2009 stating that Mr. Marion had appraised Defendant's coin collection, and that in his opinion Defendant's coin collection was of "substantial value" and that "the contents of the collection, if sold, would likely bring a minimum price of $2,000,000." (Lindquist Aff. ¶ 9, Ex. B.)

17. International Rarities Corporation is in the business of appraising, buying and selling coins, and rare and precious metals. (Affidavit of David L. Marion ("Marion Aff.") ¶ 2.)

18. In October 2009, Mr. Marion had viewed and appraised a portion of Defendant's coin collection. (Marion Aff. ¶¶ 3, 4.)

19. The collection Mr. Marion viewed included valuable coins, called Kruggerands, and other gold coins. At the time Mr. Marion appraised the collection, one Kruggerand was worth approximately $1,050.00 and Mr. Marion saw several boxes of one-ounce gold coins, which were most likely Kruggerands, in Defendant's collection. (Marion Aff. ¶ 5.)

20. Based upon the coin collection Defendant showed Mr. Marion, including the Kruggerands, and Defendant's representation that he had several more boxes of the same type of coins, Mr. Marion formulated an estimate that the coin collection was worth in excess of $2

4

EX4 of 9.

million. (Marion Aff. ¶ 7.)

21.  Based on Defendant's representations about the value of the coin collection, his agreement to pledge the coin collection as collateral, and the letter from Mr. Marion confirming the value of the coin collection at $2 million, Crown Bank agreed to extend the maturity date of the loan to April 28, 2011. (Lindquist Aff. ¶ 10.)

22.  Crown Bank would not have granted this loan extension without sufficient additional collateral. (*Id.*)

23.  On or around January 20, 2010, Defendant provided Crown Bank with a verified personal financial statement, dated June 2009 and verified on January 20, 2010. Defendant Nelson represented the following as his assets and liabilities:

    (1) His two residences at $6,952,277.09 and $989,577.13;
    (2) Total liabilities of $7,414,865.15; and
    (3) His net worth of $16,135,818.91.

(Lindquist Aff. ¶ 25, Ex. E.)

24.  On March 25, 2010, while Crown Bank was retrieving Defendant's coin collection from his home, Defendant again represented that the coin collection Crown Bank was obtaining as collateral was the same collection Mr. Marion had appraised and described in his October 2009 letter. (Lindquist Aff. ¶ 12.)

25.  On March 25, 2010, while Defendant was packing up the coin collection, Defendant stated that he had forgotten that some of the particular coins were included in the collection, making the collection more valuable than he had initially estimated. Defendant represented to Mr. Lindquist that, in light of presence of these coins, the value of the coin collection likely exceeded $3,000,0000 to $4,000,000. (Lindquist Aff. ¶ 13.)

26.  After Defendant and Mr. Lindquist loaded the coin collection, Defendant read and

5

EX5 of 9.

signed the amended promissory note that extended the $3,000,000 Loan's maturity date, and a new security agreement in which Mr. Nelson granted the bank a security interest in the coin collection. (Lindquist Aff. ¶ 14.)

27. Thereafter, Defendant defaulted on his Loan obligations. (Lindquist Aff. ¶ 16.)

28. Pursuant to its rights under the Security Agreement, on October 20, 2010, Crown Bank mailed Defendant a Notice of Disposition of Security Interest Security Agreement ("Notice"), informing Defendant that on or after November 5, 2010, Crown Bank would sell the collateral, described in the Security Agreement as Curtis C. Nelson's coin collection contained in eleven bins. (SAC Ex. M.)

29. On November 9, 2010, Mike Abbott, an expert numismatist from Marc One Numismatics appraised the coin collection. (Lindquist Aff. ¶¶ 17, 18.)

30. Mr. Abbott's appraisal revealed that the collection was not as Defendant had represented it to Crown Bank or Mr. Marion. The collection contained junk coins, and did not contain the Kruggerands that had been in the collection at the time Mr. Marion valued the coins. (Lindquist Aff. ¶ 19; Marion Aff. ¶¶ 9, 11.)

31. Mr. Abbott indicated that the coin collection was worth approximately $39,500. (Lindquist Aff. ¶ 19, Ex. C.)

32. After learning about the true value of the coin collection, in early November 2010, Mr. Lindquist requested an owner's and encumbrance report regarding Defendant from a title company (the "O&E Report"). (Lindquist Aff. ¶ 22.)

33. The O&E Report included an April 15, 2009 pleading entitled, Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree from the Family Court Division of Hennepin County Courts (the "Divorce Decree"). (Lindquist Aff. ¶ 26.)

34. According to the Divorce Decree, Defendant obtained an appraisal of his residences on July 31, 2008, approximately one month before he signed the loan documents with Crown Bank on August 28, 2008. (Lindquist Aff. ¶¶ 27, 3.)

35. The Divorce Decree states that Defendant submitted an appraisal showing that the homes were valued at $3,689,000 as of July 31, 2008. (Lindquist Aff. ¶ 27.)

36. Defendant had a duty to provide notice of this material change in value to Crown Bank before the loan documents were signed. (Lindquist Aff. ¶ 28.)

37. Defendant did not provide Crown Bank with an updated appraisal of his personal residences. (*Id.*)

38. Defendant continued to represent that the value of his personal residences exceeded $6,900,000 in 2009 and 2010. (Lindquist Aff. ¶ 28, Exs. D, E.)

39. The Divorce Decree identified significant debt Defendant owed to his parents, including a loan in the amount of $8,649,656 payable to the Glen Nelson revocable trust, as of February 8, 2007; Carlson Real Estate Company note in the amount of $1,505,964 and a note payable to Arlene Carlson; additional notes payable to Glen Nelson in the amount of $101,040 and $103,853; and a debt payable to his mother, Marilyn Nelson, in the amount of $111,886. (Lindquist Aff. ¶ 29.)

40. None of these debts were identified in Defendant's verified personal financial statements. (*Id.*)

41. The amount of Crown Bank's claims against Defendant total $4,262,275.22 in principal, interest and late charges and fees. (Lindquist Aff. ¶ 2.)

## CONCLUSIONS OF LAW

1. Plaintiff has demonstrated facts that show that pre-judgment attachment is appropriate due to Defendant's intentional fraud upon Crown Bank to induce Crown Bank to

7

EX7 of 9.

extend a $3,000,000 Loan to Defendant and to extend the maturity date of the $3,000,000 Loan.

2. Crown Bank has a cause of action against Defendant for the breach of three loans Crown Bank made to Mr. Nelson, totaling more than $3,130,000.00 in principal. Additionally, Crown Bank has a claim against Defendant for breach of a guaranty agreement under which Defendant agreed to absolutely and unconditionally guarantee payment of $1,000,000.00 on a $2,000,000.00 loan to a third party.

3. The Court finds that Plaintiff has demonstrated facts to satisfy Minn. Stat. § 570.026 to warrant the grant of an attachment of Defendant's property.

4. The conditions outlined in Minn. Stat. § 570.026 are met because the affidavits, exhibits and oral testimony establish that Defendant has committed an intentional fraud upon Crown Bank.

Based on the foregoing findings, IT IS HEREBY ORDERED that:

1. Defendant Nelson is ordered to disclose in writing all of his interests in real and personal property and any and all interests in partnerships, limited liability companies, and corporations by January 11, 2011 to Christine N. Lindblad, Oppenheimer Wolff & Donnelly LLP, 3300 Plaza VII, 45 South Seventh Street, Minneapolis, MN 55402.

2. Plaintiff shall, upon receipt of Defendant's identification of property and assets, ~~modify~~ Defendant's Counsel of the same at least identify Defendant's non-exempt property for attachment ~~and submit~~ a Writ of Attachment to the Court identifying the property to be attached within ~~five~~ days. ~~Plaintiff~~ ~~ten (10)~~

[margin note: ten (10) days prior to submitting]

3. The sheriff of Hennepin County or of any other county of this State where the property listed in the Writ of Attachment may be found shall attach such property without delay by seizing possession of said property and retaining the same in his or her custody under further Order of the Court of by stipulation of the parties. The sheriff shall assist Plaintiff concerning all

8

EX8 of 9.

reasonable requests related to the execution of the Writ of Attachment.

4. Nothing in this Order should be construed to attach property that is exempt from seizure pursuant to Minnesota or federal law.

5. This Order shall remain in place until further order by the Court, or by agreement of the parties.

12/28/10

Judge John J. Sommerville